UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10756

ROBERT E. RICCIARDELLI
CARPET SERVICE, INC.

v.

HOME DEPOT U.S.A., INC.,
JOHN ST. LAWRENCE, and
BRIAN WORCESTER

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

January 15, 2009

STEARNS, D.J.

Defendant Home Depot U.S.A., Inc., contracted with plaintiff Robert E. Ricciardelli

Carpet Service, Inc. (RER), to furnish and install carpet purchased by Boston-area Home

Depot customers.  RER alleges that personal animosity led defendants John St. Lawrence

and Brian Worcester, both of whom are Home Depot Service Managers, to mislead Robert

Ricciardelli, RER's principal, into believing that Home Depot intended to expand its

business relationship with RER.  In anticipation, RER retained excess warehouse and

workroom space, and purchased or leased sophisticated technology and support services.

The Complaint is framed on common-law claims of breach of contract and intentional and

negligent misrepresentation.  The Complaint also alleges that Home Depot issued RER

hundreds of fraudulent "chargebacks"; wrongfully terminated RER's Installer Agreement;

and ultimately "executed a company-endorsed plan to render [RER] unable to work for any

of Home Depot's competitors."  Second Amended Complaint ¶ 53.  RER identifies eleven

categories of alleged damages ranging from "lost profits" to the value of its business "as a going concern." In due course, defendants moved for summary judgment. The court heard oral argument on the motion on August 5, 2009.

BACKGROUND

The material facts construed in the light most favorable to RER as the nonmoving party are as follows. From July 1994 until February 2007, Home Depot contracted with RER (along with several other flooring companies) to install carpeting for customers in the Boston area (Market 39). The Installer Agreement was non-exclusive and contained no volume or quantity commitments. A pricing schedule attached to the Agreement listed the allowable charges that installers could bill Home Depot for carpeting, padding, and other items and services associated with the installation. The Agreement was terminable by either party "at any time, by giving the other party at least thirty days' written notice." It also provided that the "Contractor shall comply with all of The Home Depot's rules and regulations and policies of customer service and customer relations," and in any customer dispute "the Home Depot's decision shall be final and binding upon Contractor."

Under Home Depot's "Furnish and Install" program, RER purchased its carpeting and supplies at prices negotiated by Home Depot. RER operated storage warehouses in Billerica (18,700 sq. ft. at $8,700 per month), and Avon, Massachusetts (4,800 sq. ft. at $2,800 per month), to house its inventory of carpeting and padding. When a customer purchased a carpet from Home Depot, the originating store would send RER a Work Order. RER would then contact the customer to make arrangements for the delivery and

installation of the carpet.  From time to time, RER would determine that the installation required additional work.  On these occasions, RER would submit a Change Order to the originating store.  If approved, RER would bill Home Depot for the extra charge after completing the installation.  RER would then obtain a lien waiver from the customer.  The submission of the lien waiver to the originating store would cause a "key rec" to issue to Home Depot's Store Support Center in Atlanta.  The Support Center would, in turn, make payment to RER.

In some instances, Home Depot would issue a "chargeback" to RER.[1]  Chargeback decisions were usually made by expediters, the Home Depot salespersons who put installers in contact with customers and who supervised the installation work.  Statement of Facts (SOF) ¶ 19.  Because a chargeback typically occurred after payment had been approved through the key rec process, it was handled as a separate debit rather than as a deduction from the amount originally approved for payment.  According to RER, Home Depot assessed it $317,740.03 in chargebacks from 2003 to 2006 ($71,244.35 in 2003;

---

[1]A chargeback is a charge assessed against an installer in the following circumstances:

> 1) work which Home Depot claims was not done properly, 2) alleged improper conduct by the particular installer, 3) an installation that for some reason was claimed to be something other than what the customer ordered, 4) alleged problems with the carpet such as a manufacturing defect or dye color difference between one carpet and another, 5) alleged seam errors, 6) alleged scratches below the plugs or other damage allegedly done to a customer's home, 7) because of alleged missed appointment, 8) work allegedly not done, 9) chargebacks made because of an alleged short measure . . . .

Commito Decl. ¶ 4.

$115,797.38 in 2004; $66,905.91 2005; and $63,792.39 in 2006).  The Second Amended Complaint alleges that "approximately 40% of the chargebacks  [$127,096.91] issued by [Home Depot] were false and fraudulent."  Id. ¶ 62.  In supplemental answers to interrogatories, RER revised its estimate of "fraudulent" chargebacks downward from a total of $129,096.91 to $29,467.28.[2]  See Chaffin Decl. at Ex. 3.

According to Robert Ricciardelli, "the trouble" between RER and Home Depot began at a meeting on July 11, 2003, when he was assaulted by Edward Camp, a Home Depot employee.[3]  RER asserts that after the confrontation, its relationship with Home Depot began to change.

> After the assault, Ricciardelli noticed that over time, Home Depot reduced the number of purchase orders/business it sent to Ricciardelli, and . . . executed a longstanding plan to terminate RER in such a way so as to effectively extinguish RER as a business, prevent it from obtaining work at Lowe's or other competitors, . . . cause RER to transfer RER's Billerica warehouse (and thousands of square yards of carpet and the other physical assets used at that facility) at the artificially low cost of $85,000 to American Carpet Service, seamlessly transfer the identities of and control over RER installers, and obtain the continued service of RER's key management personnel to American.

Hoch Decl., Ex. 3 (Chapter 93A Demand Letter).

RER contends that among the harbingers of the chilled relationship was a decision

---

[2]According to Deborah Schad, the Manager of Home Depot's Financial Operations, "as of May 27, 2008, RER's account showed an open debit balance of $20,633.19, reflecting chargebacks assessed towards the end of RER's work with Home Depot." Schad Decl. ¶ 7. RER moved to strike Schad's declaration (Docket # 54) because "her existence and identity were not previously disclosed by the defendants." The motion was denied by the court on November 9, 2009.

[3]Ricciardelli claims there were several witnesses to the assault, including his wife Bridget. Camp's employment with Home Depot ended in 2004. Camp Decl. ¶ 2.

taken by Home Depot after the altercation with Camp to terminate RER "from individual stores in [its] market area."[4]    Despite the terminations, Ricciardelli claims that St. Lawrence (and his predecessor James Cookter), and Worcester (and Worcester's predecessor, Dan Young), assured him "that Home Depot was going to give [RER] more business."   Ricciardelli cites a statement allegedly made by Worcester at a Home Depot "line review"[5] in November of 2006, that "we [RER and Home Depot] were going to need the Billerica, Massachusetts, warehouse/workroom space."   Second Amended Complaint ¶ 35.   RER claims that defendants "knew that the representations were false," but sought to induce RER "to preserve Ricciardelli's storage, distribution and workroom facilities for the benefit of Home Depot and Ricciardelli's successor . . . [and] to carry the expense of unneeded overhead even though Home Depot intended to terminate Ricciardelli."   Id. ¶¶

---

[4]The alleged terminated store locations were in Worcester, Auburn, and Shrewsbury, Massachusetts.  RER does not provide the date, format, or substance of the termination notices, although it claims the terminations are documented in "a string of emails dated May 2, 2005."  RER acknowledges that under the Installer Agreement, Home Depot had the right to terminate (on thirty-days notice) stores that it decided to close or that no longer offered flooring services.  Home Depot denies that RER was "terminated" from the three stores, but admits that there may have been a decline in the volume of RER's business from those stores because of the implementation of Home Depot's new Special Orders and Services Improvements (SOSI) ordering and payment system.  St. Lawrence Decl. ¶ 33.

[5]For a "line review," Home Depot invites existing and prospective flooring (carpet and hardwood) installers to make presentations addressing aspects of their business ("past performance, capabilities, plans for growth, and quality assurance and control."). The November line review was held over two days in Canton, Massachusetts.  Five companies were invited to make presentations.  According to Home Depot, its criteria for selecting installers after the review was:  "(1) ability to serve as a one-stop-shop for flooring; (2) plans for and planned investment toward improving service, growing operations, and enhancing efficiency; (3) plans for in-store activities to promote sales and train associates; and (4) plans relating to installer training and enhancement of service quality."  Sherman Decl. ¶ 9.

38-39.  RER claims that Home Depot's intent was to "eliminate Ricciardelli . . . [and] to minimize disruption to Home Depot's ability to sell and install carpet in Ricciardelli's market area after it terminated Ricciardelli."  Id. ¶ 40.  Defendants' ultimate intent was to "[l]eave Ricciardelli with no option at termination, such as working with a competitor of Home Depot such as Lowe's, and to obtain control over Ricciardelli's physical assets at . . . a substantial discount [for] . . . a successor hand-picked by Home Depot."  Id. ¶ 41.

> As evidence of the hatching of the scheme, Ricciardelli testifies that
>
> [o]n or about the middle of May of 2006, people who [he] determined were Bruce Deluca and Anthony White were observed taking down the license plate numbers of RER's installers at RER's warehouse/workroom facility at 100 Chelmsford Road, Billerica, MA.  I believed Mr. Deluca to be the CEO of U.S. Installation Group and I believed Mr. White was affiliated with Home Depot at the time. I went to a gas station where Mr. Deluca and Mr. White were parked and asked them why they were taking down the license plate numbers of RER's installers.  They denied knowing who I was and denied taking down license plate numbers.

Ricciardelli Decl. ¶ 5.  RER also offers an exchange of emails between St. Lawrence and Young on May 2, 2005, in which Lawrence asks Young "whether terminating RER from the Worcester store was 'going to follow our game plan.'"

Not unexpectedly, Home Depot's version of events differs in a number of material respects.  According to Home Depot, in the fall of 2006, St. Lawrence asked Worcester to arrange a line review of Home Depot's existing Boston-area flooring installers, and also to prospective installers looking to do business with Home Depot.  In late October or early November of 2006, Worcester invited RER, 4 Seasons Carpet Workshop Inc., and AAA Carpet LLC (all then under contract to Home Depot) to the line review.  Worcester also sent invitations to American Carpet South (American), an installer for Home Depot in

6

northern New England, upstate New York, and western Massachusetts, and United States

Installation Group, Inc. (USIG), another Home Depot installer doing business outside the

Boston area.   The line review took place on November 15 and 16, 2006, in Canton,

Massachusetts.   Home Depot was represented at the line review by Worcester, St.

Lawrence, Thomas Dickson (Home Depot's National Installation Merchant), two District

Services Managers – William Sherman and James Elder – and Peter Tavano, a Market

Services Manager.   Worcester described the results of the review as follows.

> USIG and American's presentations were excellent. Each came armed with
> a multi-page PowerPoint presentation that addressed all of the subjects
> referenced in the invitation, including past performance, capabilities, plans
> for growth, and quality assurance and control.  During its presentation, USIG
> remotely accessed, via a laptop computer linked to the internet, one of its
> many workrooms and thus demonstrated USIG's capacity to monitor the
> performance of all of its workrooms on a real time basis.  AAA and 4
> Seasons' presentations were not impressive.   RER's presentation was
> unsatisfactory.   Its presentation materials consisted of a single sheet of
> paper describing its declining sales and stating, without presenting any plan
> or details, that it was capable of handling a greater volume of installation
> work. RER presented no plans for improving or expanding its service and
> business. It also failed to provide the "proposed costing" that had been
> requested.   When we advised RER that it would be required to start
> installing "hard surfaces" such as hardwood flooring in addition to carpet,
> and asked RER for its plans in this regard, Mr. Ricciardelli simply asserted
> that RER was capable of doing such installations, but provided no detail or
> specifics beyond that general statement.

Worcester Decl. ¶¶ 4-13.[6]  After the presentations, the Home Depot representatives met

and decided by "consensus" to replace RER, AAA, and 4 Seasons with American and

---

[6]On November 17, 2006, Ricciardelli sent Worcester the pricing submission that
had been requested, although the submission did not include the pricing requested for
installation of hard surface flooring.  See Worcester Decl. ¶¶ 13, 15.

USIG as the exclusive installers in the Boston area.[7]  Id. ¶ 14.

On January 2, 2007, St. Lawrence, Worcester, and Dickson sent Ricciardelli a letter stating that, as of February 6, 2007, Home Depot would no longer do business with RER as a result of the November 2006 "Flooring Review."  Lawrence Decl., Ex. 4.  RER contends that the termination letter was ineffectual as it did not clearly state that the Installer Agreement was being cancelled.  On April 27, 2007, Worcester sent Ricciardelli a more formal letter of termination listing May 27, 2007, as the effective termination date.[8]  RER ultimately sold its business assets to American for $85,000.

On April 9, 2008, RER filed this action in the Middlesex Superior Court.  Defendants removed the case to this court on May 5, 2008, invoking diversity jurisdiction.  The Amended Complaint is in six Counts: Count I - breach of contract (Home Depot); Count II - breach of the implied covenant of good faith and fair dealing (Home Depot); Count III - intentional misrepresentation/fraud (all defendants); Count IV - negligent misrepresentation (all defendants); Count V - unjust enrichment (Home Depot); and Count VI - violations of Mass. Gen. Laws ch. 93A (all defendants).  RER claims damages of $499,971.33 in lost

---

[7]Worcester, St. Lawrence, Dickson, and Sherman testified that in making the decision they considered each participant's ability to serve as a "one-stop-shop for flooring; plans for and planned investment toward improving service, growing operations, and enhancing efficiency; plans for in-store activities to promote sales and train associates; and  plans relating to installer training and enhancement of service quality." Worcester Decl. ¶ 14.

[8]For reasons unexplained, on April 13, 2007, Sam Aquillano, from Home Depot's "SVP & President Services," sent RER a copy of a new Installer Agreement.

profits (from February 6, 2007, through February of 2008), $1,226,646.50[9] in the lost "value of RER as a going concern," and $20,467.28 in restitution for fraudulent chargebacks.

As part of its damages claim, RER states that it spent $243,000 on information technology support, computer hardware, and computer software to insure that its IT systems "dovetailed" with Home Depot's SOSI ordering and payment system. Home Depot began installing SOSI in its stores in mid-2006. SOSI assigned orders to installers based on customer zip codes rather than store locations. It also enabled installers, through a website, to provide Home Depot with updates on progress with customer orders.[10] SOSI did not, however, live up to expectations, and its implementation was suspended indefinitely by Home Depot in 2007. RER claims to have purchased a more sophisticated replacement for SOSI (the 2-way XML system) and "was ready to implement it," but never had the opportunity to do so. Ricciardelli Decl. ¶ 12.

## DISCUSSION

A district court will grant summary judgment "if the pleadings, the discovery and disclosed materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

---

[8]RER claims that its "combined corporate profit and management salaries for the years 2003-2006, inclusive, averaged $461,512.00 or $38,459.33 per month." Not inconsistently, Home Depot contends that RER recorded approximately $16 million in revenue from 2003 to 2006, nearly all from Home Depot carpet sales and installation work.

[10]Home Depot contends that SOSI's installation requirements were minimal and that an installer needed only a PC with internet access and Adobe software. According to Home Depot, the required investment to implement SOSI was at most "a few thousand dollars."

P. 56(c).  A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The nonmovant in turn bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe."  Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Consequently, "a party opposing summary judgment must present definite, competent evidence to rebut the motion."  Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (internal quotations and citations omitted).

Breach of Contract

The parties do not dispute that Home Depot's Installer Agreement was a contract, and that their contractual relationship is governed by Georgia law (Agreement ¶14.12). "A contract is an agreement between two or more parties for the doing or not doing of some specified thing."  Ga. Code Ann. § 13-1-1.  To establish the existence of a contract under Georgia law, a plaintiff must demonstrate three elements: the subject matter of the contract, consideration, and mutual assent to all material terms by the parties.  See Trickett v. Advanced Neuromodulation Sys., Inc., 542 F. Supp. 2d 1338, 1350 (S.D. Ga. 2008), citing Roland v. Ford Motor Co., Inc., 288 Ga. App. 625, 629-630 (2007).  RER also agrees that Home Depot had the right to terminate the Agreement at will on thirty-days notice.

RER contends that Home Depot breached multiple provisions of the Installer Agreement "by failing to transmit purchase orders after January 2, 2007; by terminating

10

[RER] from individual stores; by issuing false and fraudulent chargebacks [including its failure to give RER an opportunity to rectify any shortcomings before issuing the chargebacks]; by failing to pay markdowns [additional work which did not appear on original work orders totaling $542,837.69]; by failing to pay open invoices in 2007 [twenty outstanding invoices totaling $14,796.55]; by withholding funds after termination; by failing to pay agreed-upon prices for carpet pads [totaling $26,945.60]; and by unilaterally deciding to use rip-up yardage figures to determine yardage of newly installed flooring." Second Amended Complaint ¶ 130.  Home Depot disputes that there was any breach, or that it owes the amounts claimed by RER.  Home Depot, for its part, has counterclaimed for $19,075.84 in alleged overpayments.

The Installer Agreement by its own terms was nonexclusive.  Home Depot had no obligation to contract with RER or any other installer on any given job.  There was no quantity term: Home Depot was not required to provide RER with any minimum amount of installation work.  The Agreement had no stated duration: it was terminable without cause "at any time, by giving either party at least thirty days' written notice."  The prices that RER was permitted to charge Home Depot for work performed were not negotiable: they were listed in an annex to the Agreement, which was revised periodically (and unilaterally) by Home Depot based on current market conditions.

RER contends that Home Depot's refusal to give it further Work Orders after the cut-off date established in the initial February 2, 2007 "letter of termination" constituted a breach of the Installer Agreement.  RER also asserts that Home Depot wrongfully terminated it in 2006 from doing work for customers at its Worcester, Auburn, and

11

Shrewsbury stores.  RER argues that while the Installer Agreement permitted termination with thirty-days notice, there was no right to terminate RER from a particular store unless the store ceased all sales of flooring.  Despite the lack of a quantity requirement in the contract, RER argues that the parties' "course of dealing" required that Home Depot send it approximately $38,459.33 in business each month.

A sales contract is enforceable under Georgia law only when it specifies the quantity of the goods sold.  See Jones v. Baran Co., LLC, 290 Ga. App. 578, 582-583 (2008); Henry v. Blankenship, 284 Ga. App. 578, 580-581 (2007).  Because the Installer Agreement contained no quantity term it is unenforceable as a sales contract.  While Georgia law permits resort to "course of dealing" evidence to demonstrate an implicit or explicit agreement to vary the terms of an existing contract, it does not authorize a court to insert a term into an otherwise fully integrated agreement.  The relevant Georgia statute states: "The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."  Ga. Code Ann. § 11-1-205(4).

Even assuming that Home Depot's February termination letter was facially defective, Ricciardelli testified that he was made aware in a letter of January 2, 2007, of Home Depot's intention to terminate RER's contract.[11]  In the letter, Home Depot informed

---

[11]While RER claims that the January 2, 2009 Home Depot letter did not inform RER that it was "terminating it," Ricciardelli testified that he talked to Dickson that same day and understood from the conversation that RER's contract with Home Depot "was cancelled." Ricciardelli Dep. at 360.

Ricciardelli that RER would continue to receive work orders through February 6, 2007,

"meaning that RER could have continued to work until late February 2007, and probably

beyond." Home Depot Memorandum at 11.  RER chose instead to cease doing business

with Home Depot on February 2, 2007, and to transfer ("immediately") all of its outstanding

work orders to American.[12]

<u>Chargebacks</u>

The "Rules and Regulations; Customers Service" clause of the Installer Agreement

provided that:

> Contractor shall comply with all of The Home Depot's rules and regulations
> and policies of customer service and customer relations. Should any
> complaints arise between a customer and Contractor with respect to any
> Services performed, Contractor shall comply with The Home Depot's
> customer service policies, and satisfy the customer.  The Home Depot shall
> have full rights to investigate, including the right to examine and reproduce
> any records or files that relate to said complaint, and to make all
> adjustments.  The Home Depot's decision shall be final and binding upon
> Contractor. Contractor shall be liable to The Home Depot for any returns,
> refunds, or adjustments made by The Home Depot, at any time, in
> accordance with this Agreement.

There is little if any dispute that "adjustments" are permitted under the Installer Agreement

and that RER is bound by the stated terms of any chargeback.[13]  Under Georgia Code §§

11-2-201(2) and 202, where the sale of goods is "between merchants," an invoice

constitutes written confirmation of the terms of the sale and is enforceable unless a written

---

[12]RER offers no competent evidence disputing Home Depot's assertion that RER
was never "terminated" from doing business with any of its individual stores.

[13]Home Depot makes the same persuasive argument regarding invoices that Home
Depot issued regarding pricing (carpeting and padding), and add-on work.

notice of objection is given by a party within ten days of its receipt.[14]  See also Ardus Med.

Inc. v. Emanuel County Hosp. Auth., 558 F. Supp. 2d 1301, 1310-1311 (S.D. Ga. 2008)

(under Article 2 of the Georgia Uniform Commercial Code (UCC), a hospital's acceptance

of the shipment of IV pumps and failure to object to the invoice within ten days forfeited

any claim of a breach).  If the chargeback is considered an "additional term" added to the

parties' original invoice, "between merchants such terms become part of the contract

unless . . . [n]otification of objection to them has already been given or is given within a

reasonable time after notice of [the additional term] is received."  Ga. Code Ann. § 11-2-

207.

RER contends that the UCC does not apply as the agreement with Home Depot was

for the provision of services to third-party customers.   Home Depot counters that it

purchased (on behalf of customers) carpeting and padding from RER that RER in turn

procured the carpet from the manufacturers.  Thus, in the transactions that

---

[14]Specifically, Ga. Code Ann. § 11-2-201, statute of frauds requires that

(1) Except as otherwise provided in this Code section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) of this Code section against such party unless written notice of objection to its contents is given within ten days after it is received.

involved a chargeback or any of the alleged undercharges (an alleged markdown, carpetpadding, or "rip up" yardage) the cost of the goods – the carpet and padding – in almost all instances far outweighed the cost of the service. Thus the predominant purpose of the RER/Home Depot transaction was the sale of goods, and accordingly, the Uniform Commercial Code applies.

Reply Memorandum at 9.  Under Georgia law

"[i]f a contract involves only the sale of goods, the UCC applies."  However, "[d]ifficulty arises in determining whether the UCC applies to a hybrid contract," such as one involving both goods and services.

When difficulties in interpreting the UCC arise, it "shall be liberally construed and applied to promote its underlying purposes and policies." Those purposes and policies are (a) To simplify, clarify, and modernize the law governing commercial transactions; (b) To permit the continued expansion of commercial practices through custom, usage, and agreement of the parties; [and] (c) To make uniform the law among the various jurisdictions. . . . [U]nder Georgia law, "[t]o determine whether a sales contract is governed by the UCC, 'we must look to the primary or overall purpose of the transaction.'"

"When presented with two elements of a contract, each absolutely necessary if the subject matter is to be of any significant value to the [parties], it is a futile task to attempt to determine which component is 'more necessary.' Thus, (we must look) to the predominant purpose, the thrust of the contract as it would exist in the minds of reasonable parties. There is no surer way to provide for predictable results in the face of a highly artificial classification system."

Therefore, the "predominant purpose" test is a way, consistent with the text of the UCC, to "simplify, clarify, and modernize the law governing commercial transactions."  When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies, even though a substantial amount of service is to be rendered in installing the goods.  When, on the other hand, the predominant element of a contract is the furnishing of services, the contract is viewed as a service contract and the UCC does not apply.  A contract for services and labor with an incidental furnishing of equipment and materials is not a transaction involving the sale of goods and is not controlled by the UCC.

Ole Mexican Foods, Inc. v. Hanson Staple Co., 285 Ga. 288, 289-290 (2009) (internal

citations omitted).  Cf. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 17 (1st

Cir. 1996) ("[I]f a contract contains a blend of sale and nonsale elements, Article Two [of

the UCC] applies only if the dominant purpose behind the contract reflects a sales

transaction.").

       When Home Depot issued a Work Order (invoice) to RER for the purchase of

carpeting and padding, the installation service was incidental to the purchase itself (the

carpeting is after all the point of the transaction).   Consequently, the Work Order was a

sales contract governed by the UCC to which the objection requirements of Article 2

applied.  On the other hand, change orders that dealt with services that RER was asked

to provide over and above the initial installation of the carpeting did not implicate the UCC.

Nonetheless, the Installer Agreement expressly provided that Home Depot's determination

to issue a change order to address customer requests or complaints was "final."  RER has

failed to offer evidence that any of the change orders were for additional "services" that fell

outside the confines of the parties' contract.  See Burnham v. Cooney, 265 Ga. App. 246,

248 (2004) (plaintiff must come forward with evidence supporting a dispute of the material

facts to take a breach of contract claim to the jury).

       With regard to RER's "chargeback"[15] claims, Home Depot offers evidence that RER

_____

       [15]A chargeback is a restitutive cost to an installer when, for example, a customer is
given a credit by Home Depot because of a faulty installation or when, because of a
customer's unwillingness to work with the initially selected installer, Home Depot was
forced to send a second installer to remedy the first installer's work.  See supra note 1.
In other words, when customer satisfaction issues required Home Depot to reduce the
amount it charged to the customer or to incur extra expenses related to problems with the
first installer's performance, the difference was passed along to the responsible installer.
Chargeback decisions typically were made by expediters, the store personnel who work
with customers and installers on in-home services orders.  See St. Lawrence Decl. ¶¶ 9-

frequently passed chargebacks on to its own independent contractor/installers and, with the exception of 2003, RER's chargebacks to the independents exceeded the total amount of Home Depot's chargebacks to RER.  Home Depot asserts that as a result, RER suffered no monetary loss.  In this regard, Home Depot asked Nancy Fannon, its expert witness on damages, to calculate the total amount of installation-related assessments charged to RER by any company or customer, including Home Depot, related to RER's flooring installation contracts from 2003 through 2006, and the total amount of pass-along charges (repair deductions) assessed by RER against its subcontractors during that same period of time. Based on RER's internal financial reports (Quickbooks) for the period, Fannon produced the following chart.[16]

| | 2006 | 2005 | 2004 | 2003 |
|---|---|---|---|---|
| Total Credit Memos - Home Depot (Chargebacks Assessed Against RER By Home Depot) | $63,792.39 | $66,905.91 | $115,797.38 | $71,244.35 |

---

11.

[16]RER's records list chargebacks assessed against it by Home Depot as "Credit Memos - Home Depot"; chargebacks assessed against RER by all of its customers are listed as "Credit Memos - All Customers"; and chargebacks assessed by RER against its own installation subcontractors are listed as "Total Repair Deductions." Fannon concluded that the total of Repair Deductions levied by RER against its subcontractors exceeded both the total chargebacks assessed against RER by Home Depot, and the total of installation-related assessments charged against RER by any company or customer for which RER provided flooring installation services during the relevant period.

| Total Credit Memos – All Customers (Installation-Related Assessments Charged Against RER By All Customers) | $64,731.75 | $67,077.83 | $116,728.63 | $71,244.35 |
|---|---|---|---|---|
| Total Repair Deductions Assessed By RER Against Its Installation Subcontractors | $79,052.50 | $103,022.95 | $118,252.03 | $5,527.95 |

RER's attempted rebuttal rests on the affidavit of Licia Commito, who was employed as a billing clerk by RER from June 2004 to January 2007. According to Commito, she reconciled, on a weekly basis, the various chargebacks by adjusting any discrepancies between what Home Depot paid RER and the payment requests submitted by the installers. (Because a chargeback typically occurred after the initial payment had been approved through the "key rec" process, the deduction was handled as a separate debit rather than as a reduction of the amount initially approved for payment). SOF ¶ 19.

> Although RER's financial reports list chargebacks assessed against RER by Home Depot as credit memos, to the best of my knowledge installers were only charged back when Home Depot issued a chargeback number to RER. What this means is that the amount of chargebacks assessed against the installers could never exceed the amount of the chargebacks assessed against RER by Home Depot. For the years 2003 - 2006, RER's fiscal year ran from April 1 to March 31.

> During the time I was employed at RER, from time to time a larger chargeback would come in, which to me was a chargeback the particular installer could not pay back all at once because RER did not want to take away all of an installer's income for a particular week to pay back a chargeback in full. On those occasions, the chargeback would be paid back over time, and depending on the size of the chargeback, it was not uncommon for chargebacks to be paid back over a period of time approximating several weeks - two months, which could cross over into the next fiscal year. Furthermore, a chargeback could come in from Home Depot one month and take several months to resolve, which means the

installer deduction would not begin until the issue was finally resolved with Home Depot.

Commito Decl. ¶¶ 5-7.  RER also attached a chart of its own to Ricciardelli's Interrogatory Response No. 21 listing each allegedly fraudulent chargeback, along with the date of its issuance, the amount, customer name, purchase order number, and a comment indicating RER's basis for asserting fraud.  The Interrogatory response and Declaration, however, fall well shy of the particularity requirements of Fed. R. Civ. P. 9(b)  (the who, what, where, and when).  RER, for example, fails to indicate the nature of the listed transaction and whether and when it objected to the chargeback.  None of the comments contain sufficient information (and none of an admissible character) to permit the court to determine whether the transaction falls under the strictures of the UCC or the Installer Agreement.

The chargeback allegations in turn appear linked in Ricciardelli's mind to a provision of the Installer Agreement that he contends required Home Depot to give RER the opportunity to remedy a customer's complaint at its own expense before being assessed a chargeback.  Ricciardelli states that:

> [i]f a customer was unhappy with the installation in question, the Contract provided at ¶ 2.5 that RER be given an opportunity to correct the alleged defect in materials or workmanship.  Even if a customer contacted Home Depot and expressed dissatisfaction with the first installer sent by RER to perform the installation, RER used numerous installers during the time in question and had the ability to send a different installer working under RER's aegis, and at RER's sole expense to correct any alleged defect in materials or workmanship.[17]

---

[17]Paragraph 2.5 of the Installer Agreement reads as follows:

Contractor warrants and guarantees that all Services performed and all materials furnished by Contractor shall be free from defects in workmanship and materials for a period of one (1) year from completion of services by

19

Ricciardelli Decl. ¶¶ 10-11.  No matter how many times the court reads Paragraph 2.5 (set

out in footnote 17 in full), it cannot locate any language even remotely conferring on RER

the right to rectify a customer complaint before Home Depot assessed a chargeback.

Even assuming that there is something to support Ricciardelli's reading of ¶ 2.5, he fails

to explain how Home Depot's alleged breach of this provision of the Agreement caused

any damage to RER, more specifically why any saving in cost to RER would have resulted

given the fact that RER would have had to absorb the expense of the repairs (and, in any

event, was passing the chargebacks on to its subcontractors).

Breach of Covenant of Good Faith and Fair Dealing

"The duty of good faith and fair dealing concerns the manner of performance [of the

contract]."  Uno Rests., Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).

The covenant reflects an implied condition that inheres in every contract "that neither party

shall do anything that will have the effect of destroying or injuring the right of the other

party to receive the fruits of the contract."  Anthony's Pier Four, Inc. v. HBC Assocs., 411

Mass. 451, 471-472 (1991).  "The covenant may not, however, be invoked to create rights

and duties not otherwise provided for in the existing contractual relationship, as the

---

Contractor.  If any claim is made that a defect developed during this one (1)
year period in workmanship or in materials furnished by Contractor,
Contractor agrees to remedy said defect immediately without cost to The
Home Depot or the customer.  If Contractor fails to remedy said defect
immediately, The Home Depot or the customer shall have the right to have
the defect corrected at Contractor's expense.  Contractor agrees to pay The
Home Depot for such amount and/or hereby authorizes The Home Depot to
deduct and use a necessary amount from any sums then due or thereafter
becoming due to Contractor from The Home Depot, to reimburse The Home
Depot or the customer for amounts so paid or incurred.

purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." <u>Uno Rests.</u>, 441 Mass. at 385. Georgia law identically "imposes on both parties an implied duty of good faith in carrying out the mutual promises of the contract." <u>See</u> <u>Martin v. Croft</u>, 294 Ga. App. 643, 645 (2008).

RER claims that Home Depot breached the implied covenant of good faith and fair dealing by misleading RER into retaining the Billerica facility; by terminating the parties' contract "in such a way as to ruin [RER] as an ongoing business"; by putting RER's independent installers under surveillance "to learn their identities for purposes of appropriating them"; and by causing RER to incur the unneeded costs of the SOSI program.  As is apparent, these allegations – save for that related to the termination itself – do not arise out of any rights or duties specified in the Installer Agreement.  With respect to the termination, "[t]here can be no breach of an implied covenant of good faith where a party to a contract has done what the provisions of the contract expressly give him the right to do." <u>Nobel Lodging, Inc. v. Holiday Hospitality Franchising, Inc.</u>, 249 Ga. App. 497, 500 (2001).  The Installer Agreement gave either party the express right to terminate "at any time by giving the other party at least thirty days notice."  This is what Home Depot did.  There can be no claim for a breach of the covenant based on a party's exercise of its explicitly conferred contractual rights.  <u>Id</u>.[18]

---

[18]The covenant of good faith and fair dealing is not a freestanding cause of action; it is an implied condition governing the performance by the parties of their agreement.  <u>See</u> <u>WirelessMD, Inc. v. Healthcare.com Corp.</u>, 271 Ga. App. 461, 468-469 (2005) (summary judgment properly granted on a breach of covenant claim where there was no violation of any express or implied duty under the contract); <u>Greenwald v. Columbus Bank & Trust Co.</u>,

Intentional Misrepresentation/Fraud

To state a claim for fraud under Massachusetts law,[19] a plaintiff must allege that "(1) the defendant made a false representation of material fact, (2) with knowledge of its falsity, (3) for the purpose of inducing the plaintiff to act in reliance thereon, (4) the plaintiff relied upon the representation, and (5) the plaintiff acted to his detriment." Armstrong v. Rohm & Haas Co., Inc., 349 F. Supp. 2d 71, 81 (D. Mass. 2004). See also Bishay v. Foreign Motors, Inc., 416 Mass. 1, 12 (1993); Nei v. Burley, 388 Mass. 307, 311 (1983). Moreover, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake, duress or undue influence, shall be stated with particularity." Fed. R. Civ. P. 9(b).[20] Under the heightened pleading standard of Rule 9(b), a plaintiff must specify the "who, what, where, and when of the allegedly false or fraudulent representation." Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004).[21]

RER asserts that Home Depot intentionally misrepresented the need for RER to

---

228 Ga. App. 527, 529 (1997) (there is no independent cause of action for a breach of the covenant under the Georgia UCC).

[19]While interpretation of the provisions of the contract is governed by Georgia law, the parties do not dispute that Massachusetts law applies to the tort claims.

[20]Federal pleading Rule 9(b) applies even though a claim is asserted under state law. See Gwyn v. Loon Mountain Corp., 350 F.3d 212, 218 (1st Cir. 2003), citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938). In any event, the state and federal pleading standards are virtually identical. See Equip. & Sys. For Indus., Inc. v. Northmeadows Constr. Co., 59 Mass. App. Ct. 931, 932 (2003).

[21]See also Restatement (Second) of Torts § 526 (1977) ("A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.").

22

retain excess warehouse space and to purchase sophisticated systems technology, as well as falsely claiming that RER owed Home Depot "hundreds if not thousands [of dollars] of chargebacks." According to the Complaint, "beginning in March of 2004, and continuing in 2005 and 2006," RER repeatedly told Home Depot that "given a drop-off in installed carpet yardage, [it] intended to close down its large Billerica, MA warehouse/workroom and downsize to a smaller facility similar in size to its Avon, MA facility." Second Amended Complaint ¶ 34. RER contends that it relied on statements made by St. Lawrence and Worcester (and their predecessors) assuring both Robert and Michael Ricciardelli[22] that "they would be getting more stores so they would need a bigger warehouse," and that they "should keep [the] Billerica warehouse" and "not move to a smaller space."[23] Ricciardelli Decl. ¶¶ 26, 30-33; Michael Ricciardelli Decl. ¶¶ 7-9. With more specificity, RER asserts that during the line review meeting at Home Depot's Canton office on November 15-16, 2006, Worcester stated that "we're going to need [the Billerica workspace] because of SOSI," even though he knew that Home Depot intended to sever its relationship with RER.[24] Ricciardelli Decl ¶ 33; Michael Ricciardelli Decl. ¶ 8. RER asserts that Worcester wanted RER to retain the space "so as to minimize  disruption to Home Depot's ability to

---

[22]From 2000-2006, Michael Ricciardelli was responsible for "running the day-to-day operations of the company except as to financials, overseeing the creation of and implementation of RER's computer system, including the system requirements needed to interact and interface with Home Depot's computers." Michael Ricciardelli Decl. ¶ 2.

[23]While RER alludes to statements of other Home Depot personnel uttered between 2004 and 2006 allegedly urging RER to retain a larger warehouse capacity, none of these speakers is identified as to name or position at Home Depot. Nor are any specifics offered as to when, where, and to whom the statements were made.

[24]Worcester denies having ever made the statement. See Worcester Decl. ¶ 18.

sell and install carpet in Ricciardelli's market area after it terminated Ricciardelli . . . to obtain control over Ricciardelli's physical assets at what amounted to a substantial discount from fair market price to a successor hand-picked by Home Depot." Second Amended Complaint ¶¶ 40-41.

Under Massachusetts law, only statements of a factual nature that are false when made give rise to a cause of action for deliberate or negligent misrepresentation. See Cummings v. HPG Int'l, Inc., 244 F.3d 16, 21 (1st Cir. 2001). Statements of a promissory nature (and predictions regarding future events) are not "false when made," unless it can be shown that the maker never intended to carry out the promise (that is, misrepresented his intent at the time the promise was made), or knew that the predictions were false or that the promise was impossible to perform. Cohen v. State Street Bank and Trust Co., 72 Mass. App. Ct. 627, 631 (2008) (investment advisor's prediction that "long term results should be fine" not actionable). See also McCartin v. Westlake, 36 Mass. App. Ct. 221, 230 n.11 (1994) (alleged misrepresentations to franchisees regarding franchisor's plans to open 200 franchises using venture-capital financing were not actionable as they were not statements of fact).

"[M]ore than mere failure to perform a promise is required to support an inference of deceptive intent." Commonwealth v. True, 16 Mass. App. Ct. 709, 712 (1983). See also Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997) ("[T]his is true 'even if there is no excuse for the subsequent breach.'"). Compare McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 709-710 (1990) (statement by a party to the contract that it did not intend to enforce a contractual termination provision, and that the provision had been

24

included in the contract only at the insistence of its attorneys, could form the basis for a fraud claim to the extent that the statement misrepresented the actual intent of the speaker).

Home Depot contends that Worcester's statement amounted to no more than a prediction, and that RER has failed to offer any evidence that the statement was false "as to then existing facts."  RER offers no evidence that would permit the court (or a finder of fact) to conclude that Worcester's statement was false when made.  Nor is any evidence offered that would permit a finding that Worcester knew that the statement was false.  In November of 2006, when the statement was allegedly made, RER had a substantial portfolio of business with Home Depot.  According to RER, it recorded "$461,512.00 [annual] corporate profit and management salaries for the years 2003-2006." Second Amended Complaint ¶ 17.  Home Depot continued to give work to RER without interruption until January 2, 2007, when Home Depot notified RER of its decision to replace RER, AAA, and 4 Seasons with American and USIG.  Even then, Home Depot offered to send RER additional orders through February 6, 2007.  See St. Lawrence Decl. ¶¶ 27, 28.

RER's proffer purporting to show falsity consists of an email from St. Lawrence to Young discussing the plans of USIG to expand its Home Depot business by acquiring competitors. The email, however, does not mention any plan on the part of Home Depot to terminate RER (and in fact Michael Ricciardelli was copied on the email exchange). More to the point, the email does not mention Worcester (nor was he one of its recipients).

RER also offers the affidavit of William Phillips, the owner of AAA.  Phillips states that in March or April of 2006, Camp (who left Home Depot in 2004) told him that Home

Depot was giving the Boston market to USIG, and that he should "hook up with Bruce" so that he was not "left out of the game."  Phillips continues that in May of 2006 he began negotiations with USIG's Bruce DeLuca who told him in an email that he intended to "take over" RER's territory. (Chaffin Decl. ¶ 8, Ex. 6 at 29-41, 313-331).  While the evidence speaks to USIG's intent to acquire AAA and 4 Seasons, among other competitors, there is no evidence suggesting that Home Depot did anything to encourage USIG's ambitions,[25] or that Home Depot replaced RER with American and USIG for any reason other than its stated desire to rationalize its carpeting and flooring business.[26]

Finally, RER has offered no evidence to support its claim that Home Depot inveigled it into the purchase of a sophisticated computer system to support the implementation of SOSI.  Nor has it offered any rebuttal of the sworn statement of Lisa Sents, the Operations Process Manager of Home Depot's Services Data & Technology Team, that "[t]he requirements for the use of SOSI were minimal." Sents Decl. ¶ 6.  The 2-way XML was the "more sophisticated option that would permit Home Depot to download data directly onto an installer's computer system and vice-versa, but this was only an option and . . . RER

---

[25]RER's theory that Home Depot had been plotting to terminate RER since the alleged mid-2003 altercation between Robert Ricciardelli and its former employee, Edward Camp, makes little sense.  As Home Depot points out, if the motivation to terminate RER germinated in 2003, why did Home Depot wait until 2007 to invoke the termination clause of the contract? More significantly, why would it have chosen to act a full three years after Camp left Home Depot?  See Camp Decl. ¶ 2; St. Lawrence Decl. ¶ 35.

[26]The participants in the Home Depot line review all testify that there was no then-extant plan to terminate RER.  See St. Lawrence Decl. ¶ 26; Worcester Decl. ¶ 16; Dickson Decl. ¶ 10; Tavano Decl. ¶ 10; Sherman Decl. ¶ 10; Elder Decl. ¶ 10

did not implement it." Id. ¶ 7.[27]

### Negligent Misrepresentation

"In order to recover for negligent misrepresentation a plaintiff must prove that the defendant (1) in the course of his business, (2) supplies false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information." Nota Constr. Corp. v. Keyes Assocs., 45 Mass. App. Ct. 15, 19-20 (1998).  See also Restatement (Second) of Torts § 552 (1977).  "[T]he degree of culpability a plaintiff must prove to establish liability for negligent misrepresentation is different, and less demanding, than that to establish liability for deceit." Cummings, 244 F.3d at 24.  Generally, when analyzing negligent misrepresentation claims, Massachusetts courts ask whether the speaker was negligent in failing to discover the falsity of his or her statements. Id.  "[T]o survive summary judgment on its negligent misrepresentation claim, plaintiffs must 'produce specific facts, in suitable evidentiary form,' supporting each of the six elements of negligent misrepresentation."  20 Atl. Ave. Corp. v. Allied Waste Indus., Inc., 482 F. Supp. 2d 60, 63-64 (D. Mass. 2007), citing N. Am. Specialty Ins. Co. v. Lapalme, 258 F.3d

---

[27]With respect to Home Depot's allegedly fraudulent chargebacks, there is little if anything to discuss.  RER's own evidence fails to disclose any indicia of fraud, but instead an ever-narrowing of differences with Home Depot over the actual amount(s) at issue. In the Second Amended Complaint, RER offers some random vignettes – a Home Depot executive authoring a memorandum to store managers about "missed dollars," and two Home Depot "whistleblower" employees who were allegedly terminated for refusing to "pad the numbers" with regard to chargebacks, neither of whom has any apparent connection with Home Depot's Massachusetts operations.  Second Amended Complaint ¶¶ 64-72.

35, 42 (1st Cir. 2001).

The only alleged misrepresentation that survives a Rule 9(b) analysis – Worcester's statement regarding the need for warehouse space at the November 2006 line review – fails scrutiny on summary judgment.  Robert Ricciardelli testified that at the November 2006 line review meeting, Worcester told him in the presence of Home Depot personnel and other flooring providers – namely Jim Elder, John St. Lawrence, Tom Dixon and Peter Travano – that "we're [Home Depot and RER] going to need the Billerica, MA warehouse/workroom space because of SOSI."  Ricciardelli Decl. ¶ 33.  While RER claims to have relied on Worcester's statement to its financial detriment, it offers no evidence that Worcester knew or should have known that the statement was false, or that RER reasonably relied on Worcester's prediction as to Home Depot's (or RER's) future needs.  As RER concedes, the alleged statement was made in the context of a meeting convened to reevaluate Home Depot's relationship with its existing flooring providers (including RER), and that there was more than a possibility that Home Depot would decide to switch installers.   Under the circumstances, RER could not have reasonably understood Worcester's speculative remark about what the future might bring to amount to a binding promise on the part of Home Depot to forgo the exercise of its contractual rights.  See Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc., 455 Mass. 458, 474-475 (2009) (although usually a question for the finder of fact, whether a plaintiff's reliance on a representation was reasonable is a question of law where facts not in dispute permit only one conclusion); Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 587-588 (1996) (same).

28

Unjust Enrichment

Unjust enrichment is a theory of equitable recovery; it is not a separate cause of action.  See Lopes v. Commonwealth, 442 Mass. 170, 179 (2004).  Under the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable.  To satisfy the five elements of unjust enrichment, a plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law."  LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 294-295 (D. Del. 2000).  Where a contract governs the parties' relationship, as here, a plaintiff by definition has an adequate remedy at law, and the law of contracts provides the exclusive measure of any right to damages.  Cf. McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc., 339 F.3d 1087, 1091 (9th Cir. 2003).

Violation of Mass. Gen Laws ch. 93A

A mere breach of contract does not give rise to a Chapter 93A violation.  See Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100-101 (1979).  Cf. Pappas Indus. Parks, Inc. v. Psarros, 24 Mass. App. Ct. 596, 600 (1987) ("Every deal that goes sour does not give rise to a c. 93A claim.").  Chapter 93A reaches only those breach of contract cases that have an "extortionate quality."  Framingham Auto Sales, Inc. v. Workers' Credit Union, 41 Mass. App. Ct. 416, 418 (1996).  A deliberate or negligent misrepresentation of fact may constitute an unfair or deceptive act within the meaning of Chapter 93A. Glickman v. Brown, 21 Mass. App. Ct. 229, 235 (1985), abrogated on other grounds by

Cigal v. Leader Dev. Corp., 408 Mass. 212, 216 n.8 (1990). "Generally, liability under G.L. c. 93A is premised on a wilful misstatement of fact." Quinlan v. Clasby, 71 Mass. App. Ct. 97, 102 (2008). See Mayer v. Cohen-Miles Ins. Agency, Inc., 48 Mass. App. Ct. 435, 443 (2000). While the statute requires disclosure of all material facts known to a party at the time of a transaction, it does not impose "liability for failing to disclose what a person does not know," Underwood v. Risman, 414 Mass. 96, 100 (1993), or in the context of a negligent misrepresentation, for failing to learn a fact that the speaker could not have reasonably ascertained (or was under no obligation to investigate). See Glickman, 21 Mass. App. Ct. at 235. Where, as here, there is no breach of contract, much less one of an extortionate character (Home Depot having done no more than what the contract permitted it to do), or any statement made by Home Depot that could reasonably be construed as a deliberate or negligent misrepresentation of fact, it follows that there can be no violation of Chapter 93A.

ORDER

For the foregoing reasons, Home Depot's motion for summary judgment is ALLOWED. The Clerk will enter judgment for Home Depot on all counts and terminate the case.[28]

SO ORDERED.

/s/ Richard G. Stearns

_____

---

[28]Although Home Depot has brought a counterclaim seeking $19,075.84 for what it claims are unreimbursed overpayments to RER, the amount in question does not meet the $75,000 threshold required for diversity jurisdiction. See St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289, 291 (1938).

UNITED STATES DISTRICT JUDGE